Case number 21-1049. Transportation Division of the International Association of Sheep, Metal, Air, Rail and Transportation Workers and Brotherhood of Locomotive Engineers and Trainmen Petitioners versus Federal Railroad Administration and United States Department of Transportation. Mr. Mann for the petitioners, Ms. Mundell for the respondents, Mr. Dupree for the interviewer. Good morning, Mr. Mann. Good morning, Your Honors. My name is Lawrence Mann for the petitioners. The rulemaking before the court, decision making for the court is one that was initiated by the Association of American Railroads in 2018, where the Association of American Railroads sought to have the requirements of testing brakes on locomotives and on freight cars reduced and relaxed. There are three issues for the court to decide this morning. I would like to address first the failure of the Federal Railroad Administration to comply with Title 49 of the U.S. Code, Section 103C, and I would like to read that section. In carrying out its duties, the Administration shall consider the assignment and maintenance of safety as the highest priority, recognizing the clear intent, encouragement and dedication of Congress to the furtherance of the highest degree of safety in railroad transportation. In issuing this rulemaking, the Federal Railroad Administration made it clear that they are relaxing the regulations, and I will just point out a couple sentences by the FRA at 85 Federal Register 80544, which is the final rule, and I quote, the rule will reduce the overall regulatory burden on the railroad. Next, FRA finds that this rule relieves current regulatory restrictions. Then on the page 80545, it states that in the regulatory impact analysis accompanying the rule, FRA states, and I quote, safety may be improved due to railroad employees experiencing less risk of common injuries such as slit strips and falls by having to perform fewer physical inspections. Now, that's really absurd because what would happen is that the railroads would not discover defects and unsafe conditions if they don't perform the inspections, and slips and falls, the Federal Railroad Administration points out that the safety benefit, the positive safety benefits have not been quantified. So, in our view, this certainly does not meet the standard of the 103C, but significantly, each of the regulations that were amended in this rulemaking, each one were minimum requirements. That's part 232, part 218, and part 211. I'm sorry, 221, 218. Each one of those were amended in this rulemaking, and each are minimum standards. So, we believe that there's no way that the FRA meets the requirement of congressional intent in 103C. Can I ask you, sorry, before you get to that, I wanted to ask you about your argument about, your first argument in your brief about the opportunity to file a petition for reconsideration, and my question on that is, what would you have said in the petition for reconsideration that you didn't, if I can just finish my sentence, that you didn't and couldn't have said in your initial presentations? Well, we did not have the opportunity to point out to the FRA, which I might add, they did not analyze what would happen if a group of freight cars, which were older freight cars, would not have been inspected and placed into a train. There are 1.6 million freight cars in the United States, and the average life is currently about 20 years. It's close to 20 years, and the useful life of a freight car is, under the Association of American Railroad Standards, is 50 years, and it can go up to 65 years. Did you make that point in your initial presentation? No, we did not know what the FRA was going to do with respect to that issue. We did not do that because we didn't feel we had the opportunity to do that. The reconsideration issue is one that we don't have a problem with a Federal Railroad Administration issuing a rule that's effective at the time of the regulation is placed into the Federal Register. That's not an issue, but the issue occurs if there are problems such as were raised with safety issues and opposition to certain provisions, and under those conditions, I am unaware of any situation where the Federal Railroad Administration has ever not afforded an opportunity to allow for a petition for reconsideration by extending the effective dates for implementation. This is the first time that I've been dealing with that many years. I understand your argument on that front. What I just want to pin down is why, given the NPRM, you couldn't have said whatever you wanted to say about safety risks from old freight cars in your, or maybe you did say it in your initial presentations in response to the NPRM. Well, we certainly did point out the problems with the proposed rule, many aspects of it, but we did not at that point in time realize that the FRA would not analyze the effects of not inspecting freight cars that have not had the technological improvements. That's amazing. I'm sorry, I'm getting some feedback, but so you didn't ask for reconsideration, is that correct? You did not. We did not have the opportunity. Well, let me ask you this, I understood that there is possibly an opportunity that arises from saying there's a good reason, there's a good cause. What do you say about the fact that the regulation is made effective immediately as a potential basis for good cause? We had no basis for good cause. For good cause, there must be something on our behalf that we could not comply, or we had a valid excuse, and that didn't exist, just did not exist here. We did not have the opportunity, the regulation went into effect immediately. I understand, but I'm asking you, why couldn't you make that argument as a reason for filing an out of time motion to reconsider? You're suggesting that we should be forced to rely upon the FRA's determination where there exists significant opposition, but in only three cases that we are aware of where the FRA has granted good cause, and those were situations where there was no opposition in the proposed regulation. So, this is a case of first impression in our view. But why shouldn't you have just filed your petition, made that argument, and if the FRA rejected that argument, then we would review that. I mean, the statute says that you can file your petition for reconsideration either, you know, I think it was, what is it, 10 days before the effective date or 60 days after publication, whichever is earlier, and you're saying that we couldn't have filed 10 days before the effective date because it was effective upon publication, right? Correct. So, I mean, wouldn't your argument be that under the statute, basically, there was no way to file, so this is good cause, and then we would review that. But you've given us nothing here by not filing your petition for reconsideration. We did not because we did not feel we had good cause. And we did not, and particularly with the prior administration, we felt that this just wasn't something that would occur because the prior administrator was a former CEO of a major railroad, and he did exactly what the railroads asked in this regulation. So, we just didn't feel there was any opportunity, realistically, to seek a petition for reconsideration. Let me ask you, and that is your challenge to the regulation 232.717C regarding brake testing and inspection for tourist scenic historic and excursion railroads. I did not see in your opening brief an affidavit or any other evidence that your clients represent any employees with respect to those railroads. And a standing issue has been raised. You say you have standing in your reply brief, but we don't have any evidence that I am aware of in support of your standing. Am I wrong about that? Is there evidence in your record about that? You are not wrong about that, but the petitioners do represent some short-line railroads, not the tourist railroads. All right. So, why shouldn't we dismiss this argument in your petition for lack of standing? As to the tourist railroads, that's probably accurate. Okay. All right. Thank you. I had no further questions. Okay. So, I'm sorry. We will give you some time, unless my colleague Mr. Jackson has any questions, we'll give you some time on rebuttal. Okay. Thank you. Good morning, your honors. May it please the court. My name is Amanda Mundell on behalf of the federal respondents. I'd just like to begin by addressing a couple of the points that Council for Petitioners has raised today, because I think they unify on one theme, which is this idea that according to petitioners, this rulemaking was motivated by some desire to serve the railroad's bottom line. And I just want to make it clear that that's not the case. As the agency explained extensively in the final rule preamble and throughout the notice of proposed rulemaking, the motivating factors here for this rule are absolutely the interests of safety under 103C. Now, all of these waivers are based on decades-long experience, indicating that there's no safety drawbacks codifying those waivers. The extension of time period for off-air from four hours to 24 hours is likewise based on similar data, indicating that expanding that off-air period is safe, that there's no safety risks or drawbacks to doing that. Now, I understand that... Is not going backwards on safety what Congress meant by making safety the highest priority and obtaining it to the highest degree? You just said, well, we didn't make things worse. Is that what the FRA thinks that means? That's what they think their obligation means? Your Honor, I think maintaining safety is absolutely consistent with that statutory directive. That's what this court essentially said in the Transportation Division. No, I don't think that's essentially what we said at all. What you were doing there when you were improving safety was not inconsistent with making safety the highest priority. That's not the same thing as saying, as long as we don't go backwards. I mean, that would be an argument for, well, lap belts were better than no seat belts, so we don't need to go forward into the world of airbags or shoulder belts. Your Honor, I don't think it's inconsistent with that statutory text to say that as the agency is incrementally regulating in this put a regulation on the books that maintains safety, but makes it more efficient for industry stakeholders or more cost effective for industry stakeholders to comply with that. But even if there wasn't a safety advancement available and it was going to cost one penny more a year, your view of what Congress meant by making safety the highest priority would mean that you say, well, we don't want to impose the penny. That's more expensive. We'll just stick with what we have. That's how the FRA understands its obligation. Your Honor, I'm not sure that that's what the agency would say in that scenario, but that's quite different from what we have here. We have no indications that there are any safety risks with any of the steps that the agency took. There weren't any in my hypothetical either. And your Honor, I think under that scenario, if all things were equal, if safety was just being maintained and it would be more expensive, then I think the agency is free under 103C to consider those other factors. But if the regulation is going to make it safer, certainly. We have to decide that in this case, because it seemed to me at a number of points, you've pointed out that things would actually get, would have safety improvements. But I want to know if I have to decide that your meaning of highest priority just means don't make things worse. Well, your Honor, I think that statutory tax means that safety has to be top of mind. There's no indication that it wasn't here. There are safety benefits, at least for some of these codifications. There are certainly some safety benefits that the agency identified. Let me ask you about the one for calibrating telemetry. And I'm talking now for the older trains that didn't have those, a PLL technology or something like that. There's sometimes too many technologies in here for my brain. But for the older trains that did not have the technology. And what the FRA said is, we're washing our hands of it. We're not going to require calibration every 368 days. We are abandoning review of this. We're handing it over to private industry to set the calibration times. If they don't set calibration times, they just need to even maintain safety. A calibration period that you had labeled as successful at maintaining safety and you abandon it to nothing. Your Honor, a couple of responses to that. First of all, I think it's important to keep in mind that the number of legacy devices that that would apply to is consistently dwindling over time. What does that mean? How many are there? As of about four years ago, your Honor, there were approximately 20,000 of all such end of train devices. 20,000. Okay, that can affect a lot of people. No, no. I'm sorry, your Honor. I wasn't finished with that number. Of that 20,000 four years ago, there were about 5,500. And that number has consistently gone down. I didn't see anything about... Well, one, I'll take as given that it's a minority at this point and it's going down, which means these things are wearing out and probably need even more calibration testing than normal, but they're still being used, correct? I believe they are still in use. They're still being used on trains in which railroad workers are working, correct? That's right, your Honor. So lives will be affected by this decision, correct? There's no safety data indicating that putting manufacturers in charge of setting that calibration... There's no safety data that it won't. You said we have a good safety rule, that it had been working very well, and we're dropping it. And the only rationale it was given was not that we think... If you can point me to where they said we think this will maintain safety, you let me know. But all I said was, we're just going to hand it over. We think industry will have an incentive to not significantly change the calibration time. And for those that don't set a calibration time, which means they don't even have to set a calibration time, they can just report malfunctions after the fact. Now, is reporting malfunctions after the fact do anything to promote safety? Certainly, your Honor, that allows the FRA to that malfunction. There's no safety for them. Your Honor, any time that there is a malfunction on a train, it's reported after the fact. Right, so that didn't add anything at all. But you gave them that option, even if they didn't even have to set calibration times. You've abandoned, even licensed them to have no calibrations for the oldest, most decaying equipment. I can't for the life of me find in your federal register, I'm happy to have you point me to it, anything that suggests that this will maintain the existing level of safety. Your Honor, what I can say is that the agency found absolutely no indication that manufacturers would deviate from that typical 368-day requirement. I think there's good reason for that. That's not what they said. Your Honor, I think they have an incentive. I think they have an incentive not to deviate significantly. I don't even know what that means. But then you had a whole other provision, and if they don't set them, which means you must have thought some people aren't going to set them at all, then we'll just require them to report bad things after they happen. Your Honor, that's a fail-safe in the event that a manufacturer does not. But again, manufacturers have these incentives to either maintain these intervals or to implement ones that are reasonable for these devices. And I would point out that under that subsection F of that regulation, the calibration interval that a manufacturer does select has to be reasonable. Where did they find that would maintain the safety that we've had through government-required calibration? Your Honor, in the final rule preamble, the agency doesn't specifically state that... Where do they unspecifically state? There's nothing. The preamble does not say that... Or the analysis of that particular provision, right? Yes, it doesn't say anything. Okay. All right. Your Honor, with all that in mind, I think my time's about to expire. We'd ask that the court deny the petition. Thank you. Do my colleagues have any other questions? Okay. Thank you. We'll hear from the intervener now. Thank you. Tom Dupree for the Association of American Railroads, and may it please the court. We agree with the government that the final rule is faithful to the agency's mandate to record. I'd like to say a few words about the changes to the requirement in air brake inspections. We put into the record both... Before you do that, can I ask just two things for clarification? Yes, Your Honor. One is, do you dispute that the unions have members that work on these... I'm just going to call them historic trains or scenic trains or tourist trains, we'll call them. Okay. I don't... We don't dispute that. We didn't take that position in our brief, and I'm not aware of any reason to dispute it, but we have not disputed it. Okay. And then just because I know your time is short, I want to give you time to address what you want to say, but I just had a question. So I was a little confused reading the final rule on those, what I'm calling tourist trains for these sort of obsolete brake systems. Were there any testing requirements before this? It sounded like maybe there hadn't been much or it was inconsistent and they were making it more regularized, but I could be wrong. Were they changing something that existed before? I think there were requirements that existed before, and my understanding is that the final rule made slight adjustments to the testing regime that pre-existed the final rule. Okay. Okay. Sorry. But no problem, Your Honor. If I could say just a few words about the changes to the requirement on airbrake inspections. In our petition for rulemaking and in our comments, we submitted copious data from our members that demonstrated that there is no safety risk from having freight equipment off air for up to 24 hours. Critically, we documented the Canadian experience. Canada allows freight equipment to be off air for up to 48 hours, and there has been no adverse impact on safety. Additional evidence that was in the record before the agency included a tree analysis that showed that none of the known brake failure modes could be correlated with the time that equipment was off air. We also provided testing results from the Transportation Technology Center that found no change in brake performance based on the amount of time off air. Finally, we submitted- That was for U.S. trains? That test was only Canadian? Well, the testing was conducted in the United States. In the sense that it basically was scientific testing, where what they tried to do was to try to figure out whether there was any decrease in performance based on off air time. So again, it's just principles of physics that would apply equally across the border. The final point on off air brakes, Your Honor, we submitted substantial evidence concerning the many environmental benefits that would result from reducing the time that locomotives must spend idling. In our comments, we had projected an annual reduction of about 3,600 tons of CO2 emissions, but it actually turns out to be far more. The final rule is now on pace to deliver an annual reduction of 25,000 tons of CO2 emissions. But that's not in the record before us? It's not in the record in this proceeding, Your Honor, because it postdates the final rule. It is submitted in the record. The Biden administration asked for data concerning the environmental benefits of various department transportation rules. We put it in response to that request. I just wanted to validate the agency's judgment of the substantial environmental benefits and underscore that they're actually far more significant than anyone had anticipated. If I could address one other point, Judge Jackson made the excellent point concerning the request for reconsideration or the absence of request for reconsideration. In our reading, FRA regularly accepts untimely petitions for reconsideration. We cited examples of this in our brief. As Your Honor, Judge Jackson, you correctly noted, the regulation expressly allows for good cause, and if a literal impossibility of complying with the time limits in the case of an immediately effective rule doesn't constitute good cause, it's beyond me what would. They never filed a petition. They've never articulated anything that they couldn't have brought in their initial comments. They've never argued that had they been able to put something in the record, the answer would have been different. Again, I think there's no basis for that. How are we to interpret the general statutory obligation of the secretary having the obligation to operate with the highest degree of safety with a record that in some instances could be read as saying we'll do this because maybe it'll be better for the environment and maybe it'll save some money and safety shouldn't get any worse? Judge Wilkins, the way I read that about the mandate to prioritize safety is that safety has to be considered by the FRA. It has to be given substantial weight in the rulemaking process, but I would submit to you that, for example, if FRA were considering a mandate that, for example, said freight trains can't run faster than one mile an hour, it would be free to reject that even if that was the only way to prioritize safety because it would effectively put the industry out of business. I think that by prioritizing safety, that doesn't mean that FRA can't consider other things such as environmental benefits, such as easing the regulatory burden on railroads. I think what it means is that they can't ignore it and they have to give substantial weight to it, but it does not mean that they necessarily have to turn a blind eye to all other considerations. Of course, in this case, I think it's fairly easy, at least from our perspective, to show that FRA did, in fact, prioritize safety. At a minimum, it maintained safety. Under the waivers that were in existence that were now codified through this rule, there were dramatically documented safety increases under many of these waivers. So, they were actually codifying operating practices that resulted in safety increases. On the off-air brakes, we put in evidence in the record. I have your argument. We're over time, so thank you. Very good. Thank you, Your Honor. Any further questions? Okay. Mr. Mann, we'll give you two minutes. Mr. Mann, you're still muted. Thank you. I simply want to emphasize again that the power brake regulations are minimum standards and the FRA has never, ever stated otherwise. In fact, in 2001, when they amended the federal brake regulations, they specifically stated these were minimum standards. And I will refer the Court to 66 Federal Register 4104, and I quote, FRA, in its enforcement of the regulations, is able to inspect and oversee only a small portion of the railroad operations taking place across the country at any one time. The need for the railroads to maintain records of such operations is essential for FRA to carry out its mission of ensuring that all railroads are operating in the safest possible manner and that they comply with the minimum federal standards designed to ensure that safety. There is the FRA stating that it is a minimum federal standard dealing with brake regulations. And here they relaxed the specific requirements of inspections. The bottom line is that there are probably hundreds of thousands of freight cars that do not have the technological improvements that were referred to by Mr. Dupre in his brief. So we feel that the regulations cannot comply with 103C. Thank you very much. Thank you very much. If my colleagues don't have any questions, the case is submitted. Thank you, Counsel.
judges: Millett, Wilkins, Jackson